HARMEET K. DHILLON
Assistant Attorney General
MICHAEL E. GATES
Deputy Assistant Attorney General
CARRIE PAGNUCCO
Chief, Housing and Civil Enforcement Section
AMIE S. MURPHY (NYRN 4147401)
Deputy Chief, Housing and Civil Enforcement Section
CHARLOTTE LANVERS (CABN 257814)
Trial Attorney, Housing and Civil Enforcement Section
Civil Rights Division
    U.S. Department of Justice
    950 Pennsylvania Avenue NW – 4CON
    Washington, DC 20530
    Tel.: (202) 305-5703
    Fax: (202) 514-1116
    Email: Charlotte.Lanvers@usdoj.gov

Attorneys for Plaintiff, United States of America

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>FATHI ABDULRAHIM HARARA and NATIVE GROUNDS, LLC, d/b/a JERUSALEM COFFEE HOUSE,<br><br>    Defendants. | CASE NO. 3:25-CV-04849-SI<br><br>**OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**<br><br>DATE: September 12, 2025<br>TIME: 10:00 AM<br>JUDGE: The Hon. Susan Illston |

# TABLE OF AUTHORITIES

## STATUTE

42 U.S.C. § 2000a – 2000a-5 .................................................................................................. 2, 7

## CASES

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................ 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) ............................................................ 4, 6

*EEOC v. Glob. Horizons, Inc.*, 904 F. Supp. 2d 1074 (D. Haw. 2012) ..................................... 4, 6

*Hamm v. City of Rock Hill*, 379 U.S. 306 (1964) ...................................................................... 6, 8

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .................................................. 5, 6

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001), *amended*, 275 F.3d 1187 (9th Cir. 2001) ................................................................................................................................... 5

*State v. Costella*, 103 A.3d 1155 (N.H. 2014) ........................................................................... 6, 7

*United States v. Big D Enter., Inc.*, 184 F.3d 924 (8th Cir. 1999) ................................................ 6

*United States v. DiMucci*, 879 F.2d 1488 (7th Cir. 1989) ......................................................... 4, 6

*United States v. Garden Homes Mgmt. Corp.*, 156 F. Supp. 2d 413 (D.N.J. 2001) ................ 5, 6

*United States v. Lansdowne Swim Club*, 894 F.2d 83 (3d Cir. 1990) ...................................... 5, 6

*United States v. Prashad*, 437 F. Supp. 3d 105 (D. Mass. 2020) ............................................. 4, 6

*United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971) ............................... 5, 6

*United States v. Pelzer Realty Co.*, 484 F.2d 438 (5th Cir. 1973) ................................................. 6

*United States v. Pospisil*, 186 F.3d 1023, 1027 (8th Cir. 1999) ................................................ 6, 7

## I. INTRODUCTION

Defendants have moved to dismiss the United States' Complaint on grounds that its allegations are insufficient to amount to a "pattern or practice" of discrimination under Title II of the Civil Rights Act ("Title II" or "Civil Rights Act"), 42 U.S.C. § 2000a-5. Mot. to Dismiss ("Mot.") 1, ECF 16. In so arguing, Defendants attempt to diminish their blatant, repeated anti-Semitic discrimination as nothing more than a few "isolated incidents," too "dissimilar" in nature to infer any particular pattern of conduct. Mot. at. 5-6. As set forth below, the United States' Complaint sufficiently pleads a "pattern or practice" of discrimination under Title II, and the Court should deny Defendants' motion to dismiss.

The United States filed this lawsuit to enforce Title II against Fathi Abdulrahim Harara and Native Grounds, LLC, doing business as the Jerusalem Coffee House ("coffee house") (collectively, "Defendants"), for discriminating against Jewish customers based on race and religion.

This case is fundamentally about Defendants' policy and practice of denying service to patrons who are identifiably Jewish. On three separate occasions between July and October 2024, Mr. Harara, the owner of the Jerusalem Coffee House in Oakland, California, and his employees aggressively denied service to two prospective customers, Michael Radice and Jonathan Hirsch, because they were identifiably Jewish. Both men wore baseball caps with Stars of David on them while at or near the coffee house. Both men were verbally harassed and threatened because Defendants perceived them as Jewish and attributed traits or stereotypes to them based solely on their membership in a protected class. This pattern of behavior, as alleged in the United States' Complaint and discussed below, is clearly prohibited illegal discrimination under Title II.

## II. FACTUAL BACKGROUND

### Michael Radice

On or about the afternoon of June 10, 2024, Michael Radice, who is Jewish, walked toward the coffee house. At the time, he was wearing a baseball cap with a Star of David and Hebrew words. Compl. ¶¶ 17, 20. As Mr. Radice approached the coffee house, one of Mr. Harara's employees, who was seated outside of the coffee house asked Mr. Radice "Are you a Jew?" to which he responded, yes, and "Are you a Zionist?" to which he did not respond. *Id.* ¶¶ 20-21. The man then shouted accusations

at Mr. Radice, including statements about complicity with Israel's military actions in Gaza. *Id.* ¶ 22. Soon thereafter, Mr. Radice left.

Several weeks later, Mr. Radice returned to the area near the coffee house to attend a fundraiser for his nonprofit organization. He walked into the coffee shop to purchase a cookie before the fundraiser. *Id.* ¶ 26. Before he could place his order, the employee who had previously yelled at Mr. Radice said, "You're the guy with the hat. You're the Jew. You're the Zionist. We don't want you in our coffee shop. Get out!" and another employee gestured to the front door. *Id.* ¶¶ 28, 30. Mr. Harara and his employees followed Mr. Radice out of the coffee house while yelling "Jew" and "Zionist" at him. *Id.* ¶ 31. Mr. Harara and the employees continued to yell insults and epithets outside as Mr. Radice entered the building hosting the nonprofit fundraiser. *Id.* ¶ 32.

### Jonathan Hirsch

On October 26, 2024, Jonathan Hirsch, who is Jewish, went to the coffee house with his five-year-old son. *Id.* ¶¶ 36-37. At the time, Mr. Hirsch was wearing a baseball cap with a white Star of David on it, which is a replica of the cap used in the 1930s by the Hebrew Orphans Asylum baseball team and pre-dated the founding of Israe in 1948. *Id.* ¶ 38. Upon entering the coffee house, Mr. Hirsch ordered a coffee from an employee. *Id.* ¶ 42. After ordering, Mr. Hirsch took his son to the back of the coffee house to use the bathroom. *Id.* After using the bathroom, Mr. Hirsch and his son sat down at a table in the back of the coffee house and began playing chess. *Id.* ¶ 43.

Soon thereafter, and similar to the way he spoke to Mr. Radice, Mr. Harara approached Mr. Hirsch and demanded to know if he was a "Zionist." *Id.* ¶ 44. He also asked Mr. Hirsch if he was wearing a "Jewish star" and told Mr. Hirsch and his son to leave. *Id.* Mr. Harara told Mr. Hirsch he was "causing a disturbance" and "trespassing" and that he would call the police if Mr. Hirsch did not leave. *Id.* ¶ 46. Mr. Harara proceeded to tell Mr. Hirsch to leave, or variations of this demand, at least fifteen times. *Id.* Once the Oakland police arrived, Mr. Hirsch explained that he was ordered to leave for being Jewish and wearing a Star of David on his baseball cap. *Id.* ¶ 50. In response, Mr. Harara said, "This is a private business, and I reserve the right to refuse not to serve anyone I don't want to." *Id.* ¶ 51. He again demanded that Mr. Hirsch leave, and asked the police officers to arrest him for trespass and

OPPOSITION TO MOTION TO DISMISS
CASE NO: 3:25-cv-04849-SI                    4

physically restrain him on the sidewalk. *Id.* Mr. Harara followed Mr. Hirsch and the officers outside and continued his verbal attack. *Id.* ¶ 57.

## III. LEGAL STANDARD

To survive a motion to dismiss, the factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Court must accept the allegations as true, construe them in the light most favorable to the non-moving party, and draw all reasonable inferences from well-pleaded factual allegations. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended*, 275 F.3d 1187 (9th Cir. 2001). Thus, to overcome a motion to dismiss in a pattern or practice case, the allegations must create a reasonable inference that a pattern or practice of discrimination exists. *See e.g.*, *United States v. Prashad*, 437 F. Supp. 3d 105, 108-09 (D. Mass. 2020); *EEOC v. Glob. Horizons, Inc.*, 904 F. Supp. 2d 1074, 1085 (D. Haw. 2012).

## IV. ARGUMENT

### a. The United States Has Met Its Burden of Pleading that Defendants Engage in a "Pattern or Practice" of Discrimination Under Title II of the 1964 Civil Rights Act

The Attorney General may sue to enforce Title II whenever she "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title II], and that the pattern or practice is of such nature and is intended to deny the full exercise of [those] rights[.]" 42 U.S.C. § 2000a-5(a). A "pattern or practice" of discrimination means "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Discrimination must therefore be the "standard operating procedure: the regular rather than the unusual practice." *Id.*

In determining whether a "pattern or practice" of discrimination exists, courts have focused not on the number of incidents of discrimination, but rather on whether the particular facts of these incidents indicate a broader pattern or policy of discrimination, i.e., that the discriminatory acts or conduct are likely to be repeated under similar circumstances. Thus, in *United States v. Lansdowne Swim Club*, 894 F.2d 83 (3d Cir. 1990), the Third Circuit upheld the district court's finding of a "pattern or practice"

under Title II based on the rejections of three qualified Black applicants from a swim club. *Id.* at 87. In so doing, the Third Circuit relied not on the number of victims, but rather whether the specific facts of each rejection, coupled with other circumstantial evidence, were probative of a broader pattern of discrimination. *Id.* at 88. The court also held that "we need not find that [defendant] always discriminated to find that it engaged in such a pattern of practice." *Id.* at 89.

There is no minimum number of incidents or victims which the United States must allege or ultimately prove to establish a pattern or practice. *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("[N]o mathematical formula is workable, nor was any intended."); *United States v. Garden Homes Mgmt. Corp.*, 156 F. Supp. 2d 413, 422 (D.N.J. 2001) ("Defendants' focus on the number of incidents [of discrimination] is misplaced. The Fair Housing Act does not obligate the government to provide a minimum number of violations to establish a pattern or practice of discrimination.") (citation omitted).[1] Courts have found that two to three examples of discrimination are enough to prove a pattern or practice, even after discovery and trial. In *United States v. Big D Enter., Inc.*, 184 F.3d 924, 931 (8th Cir. 1999) the Eighth Circuit held that, "the government [had] conclusively demonstrated a pattern and practice of discrimination" based on evidence a landlord of three apartment complexes had discriminated against three tenants based on race where the landlord's employees also testified that they were instructed not to rent to Black applicants. *See also Garden Homes Mgmt. Co.*, 156 F. Supp. 2d at 421 (finding "pattern or practice" under FHA based on three fair housing tests that "yielded virtually identical results … give rise to a permissible inference that racial discrimination is not a sporadic event but, instead, is part of the way that Defendants do business.").

In *United States v. Pelzer Realty Co.*, 484 F.2d 438, 445 (5th Cir. 1973), the Fifth Circuit reversed and remanded a district court's dismissal of a complaint alleging a realty company refused to sell homes to two Black prospective home-buyers. In so doing, the Fifth Circuit determined that a pattern or practice existed based on the realty company's treatment of two men over a series of weeks, and was not limited to an offhand comment on a single occasion. *Id.* The Fifth Circuit noted that

---

[1] As courts have found, and as Defendants acknowledge, courts frequently look to case law interpreting the term "pattern or practice" under other statutes. Mot. 4; *see United States v. DiMucci*, 879 F.2d 1488, 1497 n.11 (7th Cir. 1989) ("The phrase 'pattern or practice' was not intended as a term of art, but appears in several federal civil rights statutes, and is interpreted consistently therein.").

OPPOSITION TO MOTION TO DISMISS
CASE NO: 3:25-cv-04849-SI                                            6

several of the discriminatory comments were "repeated by different people at different times," and that the company's president "enunciated and implemented" the discriminatory policy.  *Id.*

Here, Defendants' discriminatory treatment of Mr. Radice and Mr. Hirsch is probative of a broader pattern of discrimination.  As in *Pelzer Realty,* Defendants' pattern was not an offhand comment, and was "repeated by different people, at different times," and the owner, Mr. Harara "enunciated and implemented" the practice.  *Id.*   First, the Complaint clearly alleges that Defendants referred to both Messrs. Radice and Hirsch as "Jews" before ordering them to leave.  Mr. Radice was expressly called a "Jew" by one of Mr. Harara's employees on two separate occasions before being told to leave the coffee house.  Compl. ¶¶ 20, 28, 31.[2]  Similarly, Mr. Harara accused Mr. Hirsch, who was also wearing a baseball cap with a Star of David, of wearing a "Jewish star" before demanding that he leave over fifteen times and calling the police.[3]  *Id.*  ¶¶ 38, 44.  In both incidents, Mr. Harara and his employees knew nothing about Mr. Radice and Mr. Hirsch other than that they were wearing baseball caps identifying them as Jewish.  A reasonable trier of fact could easily infer from these facts that Defendants would similarly refuse to serve individuals who identified as, or whom they perceived to be, Jewish.[4]

---

[2] Defendants suggest that the first verbal attack on Mr. Radice is irrelevant because, they claim, he "was not going to the cafe, but to the East Bay Community Space," and therefore had "no intention of availing himself of the accommodations at the café." Mot. 4-5.  This is groundless.  While Mr. Radice was in the building to visit the East Bay Community Space, nowhere does the Complaint allege that Mr. Radice had "no intention" of entering the coffee house.  Instead, Defendants made the choice for Mr. Radice before he could even enter the coffee house by launching what even Defendants describe as a "disturbing" anti-Semitic attack on him.  Defendants' argument is akin to saying that a Black person who was deterred from entering a restaurant with a "Whites Only" sign was not discriminated against under Title II because they lacked an "intent" to patronize the restaurant.

[3] Defendants' argument that Mr. Hirsch was not denied service because he was served food, he and his son used the bathroom and then went to the back of the café and played chess, misapprehends the Civil Rights Act's broad requirement prohibiting the "resistance to the full enjoyment of any rights" and its prohibition against "deny[ing] the full exercise of [those] rights"[.]" 42 U.S.C. § 2000a-5(a).  Mot. At 5.  Defendants' resistance to Mr. Hirsch and his son's full enjoyment of the coffee house's amenities occurred when Defendants repeatedly demanded that Mr. Hirsch and his son leave based on their religion.  Nothing in the Civil Rights Act excuses a denial of full enjoyment based on the provision of some services – by its plain language it requires full enjoyment of any rights.

[4] Although Messrs. Radice and Hirsch are, in fact, Jewish, Defendants' liability does not turn on this fact.  Even if Defendants refused to serve individuals on the mistaken belief that they were Jewish, they would still have engaged in illegal discrimination.  *See*, *e.g.*, *United States v. Pospisil*, 186 F.3d 1023, 1027, 1032 (8th Cir. 1999) (affirming conviction under 42 U.S.C. § 3631 where defendants

Second, the individual who demanded that Mr. Radice and Mr. Hirsch leave was not a stray employee, but rather the coffee house's owner, Mr. Harara. Compl. ¶¶ 31, 51. Mr. Harara himself told Mr. Hirsch and the Oakland police that, in his view, he could "reserve the right to refuse not to serve anyone I don't want to." Compl. ¶¶ 50-51. Defendants cannot waive away their discriminatory conduct as the isolated behavior of rogue employees. As Mr. Harara made clear during his sustained verbal attack on Mr. Hirsch, he owned the coffee house and sets its policies, which include deciding, at his sole discretion, whom he will or will not serve.

Third, Defendants' attacks on Mr. Radice and Mr. Hirsch were strikingly similar in both their content and vitriol. Both men were referred to as "Jewish." On this basis, and nothing more, both were accused of supporting "Zionism" and "genocide." Both were told to leave. And both were followed out into the street by Mr. Harara and his employees, who continued to harangue them. Compl. ¶¶ 31-32, 57. The inexplicable, sustained anger and hostility that Mr. Harara and his employees directed at these victims—particularly against Mr. Hirsch, who was sitting quietly with his five-year old son—also raises an inference of a pattern of racial or religious animus and discrimination. Such hostile behavior strongly suggests animus against identifiably Jewish customers and a practice of refusing to serve them.

Fourth, the factual allegations suggest that Mr. Harara would likely adhere to the same pattern of discriminatory conduct if another identifiably Jewish patron came to the coffee house. Mr. Harara's statement to police officers further underscores his belief that he has the right to engage in a practice of discriminating against anyone, including those protected by civil rights laws, like Jewish patrons, Mr. Radice and Mr. Hirsch. Mr. Harara explained to police officers that, as the owner of a "private business," he "reserve(s) the right" to refuse service to anyone he wants. Comp. ¶ 51. This admission supports the United States' claim that these incidents were part of a deliberate, non-sporadic practice of deliberately refusing to serve customers, including on the basis of the customer's religion, a protected class under the Civil Rights Act. Mr. Harara's reasoning is similar to that offered by segregationist businesses that refused to serve Black customers, and has been rejected as a defense to race

---

attacked victims based on mistaken belief that they were African-American); *State* v. *Costella*, 103 A.3d 1155, 1162 (N.H. 2014) (under state hate-crimes law, where defendant threatened victims on mistaken belief that they were Jewish, "the State was not required to prove that the victims *are*, in fact, Jewish") (emphasis in original).

1  discrimination and segregation since virtually the Civil Rights Act's inception over 50 years ago.  *See*
2  *Hamm v. City of Rock Hill*, 379 U.S. 306, 308 (1964) (sit-in protesters at segregated restaurant who were
3  told that the establishment "reserved the right to refuse service to anyone and was not prepared to serve
4  them at that time" could not be prosecuted for trespass for refusing to leave under Title II of 1964 Civil
5  Rights Act).

6      Finally, Defendants' hostility to serving Jewish patrons is further supported by additional
7  corroborating evidence.  Among the drinks the coffee house sells are "Iced in Tea Fada," an apparent
8  reference to intifada and "Sweet Sinwar," a drink named after Yahya Sinwar, who has been described as
9  a leader of the October 7, 2023 Hamas terrorist attacks on Israel.  Compl. ¶ 10.  The coffee house began
10 offering these drinks on or about the one-year anniversary of the Hamas terrorist attacks.  *Id.*  Moreover,
11 the exterior wall of the coffee house has, or had, four inverted red triangles painted on it, a symbol that
12 has been interpreted to be a symbol of violence against Jewish people, and has, at times, been marked on
13 synagogues and Jewish schools as anti-Semitic vandalism.[5]  Compl. ¶ 11.

## V.   CONCLUSION

For these reasons, the United States respectfully requests that the Court deny the Motion.

---

[5] The United States does not take a stance on the interpretation of these terms or symbols in isolation.

| | |
|---|---|
| Dated:  August 22, 2025 | Respectfully submitted, |
| | HARMEET K. DHILLON<br>Assistant Attorney General<br>Civil Rights Division |
| | MICHAEL E. GATES<br>Deputy Assistant Attorney General<br>Civil Rights Division |
| | CARRIE PAGNUCCO<br>Chief, Housing and Civil Enforcement<br>     Section |
| | *s/ Charlote Lanvers*<br>AMIE S. MURPHY<br>Deputy Chief<br>CHARLOTTE LANVERS<br>Trial Attorney<br>United States Department of Justice<br>Civil Rights Division<br>Housing and Civil Enforcement Section |