UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FATHI ABDULRAHIM HARARA, et al.,<br><br>Defendants. | Case No. 25-cv-04849-SI<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 16 |

Defendants have moved to dismiss this action brought by the United States under Title II of the Civil Rights Act of 1964. The question at issue in this motion is whether the complaint sufficiently alleges a pattern or practice of discrimination. Pursuant to Civil Local Rule 7-1(b), the Court found this matter suitable for resolution without oral argument and vacated the hearing. For the reasons set forth below, the Court denies the motion.

**BACKGROUND**

For purposes of this motion to dismiss, the Court treats as true the factual allegations as stated in plaintiff's complaint and draws all reasonable inferences in plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

Defendants in this case are Fathi Abdulrahim Harara, owner and operator of the Jerusalem Coffee House in Oakland, California; and Native Grounds, LLC, a California corporation whose address is the same as the Jerusalem Coffee House and of which Harara is Chief Executive Officer, Chief Financial Officer, and Secretary. Dkt. No. 1 (Compl.) ¶¶ 5-6. The Jerusalem Coffee House is a business establishment open to the general public. *Id.* ¶ 7. The coffee house is located on the premises of the East Bay Community Space, "which regularly hosts events that are open to the

general public for exhibition or entertainment . . . ." *Id.* ¶ 12.

According to the complaint, on June 10, 2024, Michael Radice—who is Jewish—went to the East Bay Community Space "for the purpose of viewing the establishment for a fundraising event for his organization." *Id.* ¶ 18. Radice was wearing a dark blue baseball cap with a light blue Star of David and white Hebrew lettering. *Id.* ¶ 19. As he approached the community space from the side where the coffee house is located, a man sitting at a table in front of the coffee house asked, "Are you a Jew?" *Id.* ¶ 20. Radice answered in the affirmative. *Id.* The man then asked, "Are you a Zionist?" *Id.* ¶ 21. Radice declined to respond. *Id.* The complaint alleges that "[t]he man then began shouting numerous accusations at Mr. Radice, including that he was complicit in Israel's military actions in the Gaza Strip following the October 7, 2023 Hamas attacks and guilty of 'killing children.'" *Id.* ¶ 22. As Radice began to walk away, the man stood up and asked, "Where are you going?" *Id.* ¶ 24. The complaint alleges, "Mr. Radice saw another man, whom he later learned was Harara, walk out of the coffee house and speak to the man, and the two went inside." *Id.* ¶ 25.

On August 3, 2024, Radice returned to the East Bay Community Space to attend the fundraiser for his organization. *Id.* ¶ 26. Before doing so, "he entered the coffee shop to purchase a cookie, which he hoped would be seen as a sign of goodwill." *Id.* He was not wearing the baseball cap he had worn previously. *Id.* Behind the counter were Harara, the man Radice had previously encountered, and a third employee. *Id.* ¶ 27. Before Radice could place his order, the man from the prior encounter stated, "You're the guy with the hat. You're the Jew. You're the Zionist. We don't want you in our coffee shop. Get out." *Id.* ¶ 28. Harara asked Radice if he intended to purchase anything and Radice responded that he was only there to make a purchase. *Id.* ¶ 29. According to the complaint, "[o]ne of the employees responded by telling Mr. Radice to 'get out' and gestured to the front door. Mr. Radice immediately left the coffee house." *Id.* ¶ 30. "Harara and the two other employees followed Mr. Radice outside, yelling 'Jew' and 'Zionist' at him. Mr. Radice retreated north on Telegraph Avenue towards 55th Street. When he saw that Harara and the employees were continuing to pursue him, Mr. Radice stepped into the middle of 55th Street and behind a parked car to escape the men." *Id.* ¶ 31. The complaint alleges that "Harara and his employees continued to yell insults and epithets at Mr. Radice, which did not end until Mr. Radice and the board member

2

1    entered EBCS." *Id.* ¶ 32.

2          On October 26, 2024, Jonathan Hirsch—who is Jewish—took his five-year-old son to lunch
3    at a hot dog stand located across the street from the coffee house in Oakland. *Id.* ¶ 37. Hirsch was
4    wearing a blue baseball cap with a white Star of David on it. *Id.* ¶ 38. Hirsch's son needed to use
5    the bathroom, and as the hot dog stand does not have bathrooms, staff directed Hirsch to the coffee
6    house. *Id.* ¶ 40. Hirsch was not aware of the previous incidents involving Radice. *Id.* ¶ 41. Hirsch
7    and his son entered the coffee house, Hirsch ordered a coffee, and they then went to the back of the
8    coffee house to use the bathroom. *Id.* ¶ 42. The employee who served Hirsch was not Harara. *Id.*
9    According to the complaint, "After using the bathroom, Mr. Hirsch and his son sat down at a table
10   with a chess board in the back of the coffee house and began playing chess." *Id.* ¶ 43. Within
11   minutes, Harara "confronted" Hirsch, demanded to know whether Hirsch was a "Zionist" and
12   whether he was wearing a "Jewish star," and then demanded that Hirsch and his son leave the
13   premises. *Id.* ¶ 44. "At no time while in the coffee house did Mr. Hirsch say anything that would
14   indicate his political beliefs or positions on any issue, including Israel." *Id.* ¶ 45. Hirsch asked
15   Harara whether he worked there, and Harara then "falsely accused Mr. Hirsch of 'causing a
16   disruption' and 'trespassing'" and threatened to call the police. *Id.* ¶ 46. "While in the coffee house,
17   Harara told Mr. Hirsch, 'You need to leave,' or variations on this demand, at least fifteen times."
18   *Id.* Hirsch said that he would wait for the police to arrive, and Harara then walked to the East Bay
19   Community Space and approached an employee there (Ms. Don) to ask her help in removing Hirsch.
20   *Id.* ¶ 47. Ms. Don went to the coffee house and "initially told Mr. Hirsch that he should accede to
21   Harara's demand, noting that he had entered a 'Palestinian business.'" *Id.* ¶ 48. Hirsch stated that
22   he believed Harara was discriminating against him because he was Jewish. *Id.* Two Oakland police
23   officers arrived and Harara demanded they remove Hirsch and arrest him for trespassing. *Id.* ¶ 51.
24   The officers did not arrest Mr. Hirsch and "[t]he police report for this incident states that 'no crime
25   occurred' and 'this is being documented as a hate incident.'" *Id.* ¶ 52. The complaint states that
26   "Ms. Don later told the Oakland police that Mr. Hirsch 'wasn't trying to start a conflict' and 'was
27   being discriminated against because of his hat.'" *Id.* ¶ 49.

28         The officers requested to speak with Hirsch outside. *Id.* ¶ 53. According to the complaint,

"As they left the coffee house, Harara said, 'Bye bye! Are you a Zionist? Bye bye!'" Later, he added, 'I love Jewish people. I love them. I love them. Fuck Israel. Fuck Zionists. Fuck Zionists.'" *Id.* Harara "continued to spew insults and epithets at both Mr. Hirsch and his young son" including "repeatedly calling Mr. Hirsch a 'bitch,' a 'dog,' and a 'piece of shit.'" *Id.* ¶ 57. "When Mr. Hirsch asked Harara whether he asks every customer whether he or she is a 'Zionist,' Harara responded, 'Yeah, I do.'" *Id.* ¶ 54. The complaint alleges that "Harara does not, in fact, ask all customers if they are 'Zionists.'" *Id.* ¶ 55. Hirsch did not receive the coffee he ordered and paid for. *Id.* ¶ 56.

On June 9, 2025, the United States filed the complaint, alleging that "[d]efendants' actions . . . constitute a pattern or practice of resistance to the full and equal enjoyment by Jewish individuals of rights secured by Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a *et seq*. . . ." *Id.* ¶ 59. On July 21, 2025, the case was reassigned to the undersigned Judge based on the existence of a related, earlier-filed case involving some of the same incidents and the same defendants. *See* Dkt. Nos. 12, 13.

Defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(6). They argue that "[t]he allegations in the Complaint, even if accepted as true, do not amount to a 'pattern or practice' that would constitute a violation of Title II of the Civil Rights Act of 1964." Dkt. No. 16 (Mot.) at 1.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to above the speculative level." *Twombly*, 550 U.S. at 555, 570.

4

1  In deciding whether to grant a motion to dismiss, the Court must assume the plaintiff's allegations are true and must draw all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

Title II of the Civil Rights Act of 1964 provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). The Act further provides that, "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint . . . setting forth facts pertaining to such pattern or practice . . . ." *Id.* § 2000a-5(a).

The parties agree that the applicable legal standard is set forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977): the government bears the burden of proving "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" and must "establish by a preponderance of the evidence that [the] discrimination was the company's standard operating procedure[:] the regular rather than the usual practice." *Teamsters*, 431 U.S. at 336; *see also* Mot. at 2; Dkt. No. 23 (Opp'n) at 5. The question here, then, is whether the complaint sufficiently alleges a "pattern or practice" of discrimination against Jewish customers or whether the incidents described in the complaint are too isolated or sporadic to constitute a Title II violation. In their reply brief, defendants clarify that, "[r]ather than arguing that the number of incidents is insufficient, Defendants argue that the alleged incidents are isolated, bizarre, and dissimilar." Dkt. No. 27 (Reply) at 2.

5

Defendants have cited no analogous cases in support of their position that the incidents here are too "isolated" to constitute a pattern or practice of discrimination. The case law indicates that even just a few incidents can suffice to sustain a pattern or practice claim, particularly where the facts support a conscious or purposeful bias against a particular group. An Eighth Circuit case examining a claim of racial discrimination in housing is instructive. In *United States v. Big D Enterprises, Inc.*, 184 F.3d 924 (8th Cir. 1999), the appeals court affirmed judgment entered against an apartment complex owner and his management company following a jury trial.[1] Following an investigation by the Department of Housing and Urban Development, the United States sued under the Fair Housing Act, alleging that the defendants engaged in a pattern or practice of discriminating against minority housing applicants. At trial, several apartment managers testified that the complex owner "personally instructed them not to rent to black applicants," that he referred to black applicants by a racial epithet, and that he told the managers to tell black apartment seekers that no vacancies existed. *Id.* at 930. There was also evidence at trial regarding three individuals in particular whose housing applications were denied on the basis of their race or the race of their children. *Id.* at 930-31. The appeals court found that "the government has more than satisfied its burden of proof." *Id.* at 930.

Here, the government has alleged two instances involving explicit discrimination and denial of service to two seemingly unrelated individuals who wore baseball caps bearing a Star of David. The complaint alleges that a coffee shop employee had previously seen Radice wearing a Star of David cap and that when Radice attempted to purchase a cookie at a later date, the person behind the counter asked if he was a "Jew," refused to serve him, and ordered him to leave the shop. Compl. ¶¶ 26-28. Defendant Harara, the owner of the shop, was present and followed Radice outside, yelling "Jew" and "Zionist" at him. *Id.* ¶ 31. Several months later, Hirsch, wearing a Star of David

---

[1] Although *Big D Enterprises* was a Fair Housing Act case, "[t]he phrase 'pattern or practice' was not intended as a term of art, but appears in several federal civil rights statutes, and is interpreted consistently therein." *See United States v. Di Mucci*, 879 F.2d 1488, 1497 n.11 (citing *Teamsters*, 431 U.S. at 336 n.16). Therefore, the case may be analogized to the Title II context. The government in *Big D Enterprises* faced the same burden of proof that the government will face here of showing "that the defendant engaged in discriminatory activity as a matter of standard operating procedure." *See Big D Enters.*, 184 F.3d at 930 (citing *Teamsters*, 431 U.S. at 336).

1    baseball cap, attempted to purchase a coffee from the coffee shop. *Id.* ¶¶ 37-38, 42. While waiting
2    for his coffee, Harara approached him and "demanded to know whether Mr. Hirsch was a 'Zionist'
3    and whether he was wearing a 'Jewish star.'" *Id.* ¶¶ 42-44. Harara then "falsely accused Mr. Hirsch
4    of 'causing a disruption' and 'trespassing,' demanded that Hirsch leave, and then called the police.
5    *Id.* ¶ 46. The complaint alleges that "Harara followed Mr. Hirsch and the officers outside and
6    continued to spew insults and epithets at both Mr. Hirsch and his young son." *Id.* ¶ 57. There are
7    more similarities than differences in these incidents: the complaint alleges that two people wearing
8    (or identified as wearing) a Star of David cap were asked whether they were "Jewish" or whether
9    they were "wearing a 'Jewish star,'" were then refused service, were told to leave the coffee shop,
10   and were followed outside by Harara and others while Harara shouted "Jew," "Zionist," or various
11   insults at them. In light of such allegations of outward discrimination, the Court need not analogize
12   to other cases in which plaintiffs have resorted to statistical or other circumstantial evidence to prove
13   their pattern or practice claims. *See, e.g., United States v. Lansdowne Swim Club*, 894 F.2d 83 (3d
14   Cir. 1990) (in Title II action, affirming judgment against swim club that rejected applications from
15   three different black families who otherwise qualified for membership, where every white applicant
16   had been admitted and club had only one non-white member out of 1400 family memberships).

17         Defendants argue that the allegations here cannot establish a pattern or practice because the
18   complaint alleges only "two isolated, somewhat bizarre incidents[.]" Mot. at 2. However,
19   defendants also agree that two incidents *can* constitute a pattern or practice of discrimination and
20   clarify that they do not argue the number of incidents here is insufficient. Reply at 2. Moreover,
21   accepting defendants' characterization of the incidents as isolated and not representative of a broader
22   pattern would require reading facts into the complaint that the United States does not allege. For
23   instance, defendants argue that the Hirsch incident was unlike the Radice incident because Hirsch
24   was told to leave "because he was causing a disruption and trespassing after he had been served,
25   used the bathroom, and played chess." Mot. at 6. Nowhere does the complaint allege that Hirsch
26   was causing a disruption. Rather, the complaint alleges that defendant Harara "falsely accused Mr.
27   Hirsch of 'causing a disruption' and 'trespassing.'" *See* Compl. ¶ 46.

28         Given the small number of incidents involved, this case presents a close call. But at the

motion to dismiss stage, the Court must assume that the plaintiff's allegations are true and must construe them in the light most favorable to the plaintiff. *See Usher*, 828 F.2d at 561. Doing so, the Court concludes that the government has sufficiently alleged a pattern or practice of discriminatory conduct at this stage of the case. Whether or not the government will ultimately be able to prove its case is a question for a later day.[2]

## CONCLUSION

For the reasons stated above, the Court denies defendants' motion to dismiss.

**IT IS SO ORDERED**.

Dated: September 10, 2025

SUSAN ILLSTON
United States District Judge

---

[2] Because the Court finds the above allegations sufficient to sustain a pattern or practice claim at this stage, the Court need not evaluate at this stage the other circumstantial evidence of discrimination that plaintiff has alleged. *See* Compl. ¶¶ 10-11.